# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 13, 2000 Session

## STATE OF TENNESSEE v. ROBERT LEE PATTEE

**Direct Appeal from the Criminal Court for Sumner County**
**No. 239-1999     Jane Wheatcraft, Judge**

---

**No. M2000-00257-CCA-R3-CD - Filed May 3, 2001**

---

The defendant, Robert Lee Pattee, appeals as of right following his conviction by a jury in the Sumner County Criminal Court for first degree murder.  The trial court sentenced Defendant to life imprisonment in the Department of Correction.  Defendant raises the following issues in this appeal: (1) whether the trial court erred by refusing to instruct the jury on the lesser-included offense of voluntary manslaughter; (2) whether the trial court erred when it determined Defendant's suicide note was inadmissible at trial; and (3) whether the evidence of premeditation was sufficient to convict him of first degree murder.  After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined, and JOSEPH M. TIPTON, J., filed a concurring opinion.

John P. Cauley, Franklin, Tennessee, (on appeal) and Lionel R. Barrett, Jr. and Jefre S. Goldtrap, Nashville, Tennessee, (at trial) for the appellant, Robert Lee Pattee.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Wayne Hyatt, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

Defendant was convicted of first degree murder for the shooting death of his wife's boyfriend, Dennis Wayne Cope ("Wayne"), a forty-eight-year-old retired Marine.  At trial, Ronald David Cope, the victim's brother, testified that he and Wayne were partners in a siding and gutter

business. Ronald became suspicious when Wayne did not show up for work at 7:00 a.m. on February 5, 1999. On a typical day, Wayne did not arrive until later, but he had agreed to come in early that morning. Ronald had tried to contact Wayne by telephone the previous evening, but Wayne had not returned his calls. When Wayne did not arrive early on February 5th, Ronald attempted to contact Wayne's fiancé, Jennifer. Although Jennifer and Wayne were both married to other people, they were pursuing divorces and planned to marry when their divorce proceedings were completed. Jennifer was due to return from her vacation that week, so Ronald assumed that Wayne was with her and had merely forgotten to come to work early. When Jennifer called later that afternoon and informed Ronald that she was still out of town, Ronald became concerned and drove to Wayne's house.

When Ronald arrived at Wayne's house at approximately 2:30 p.m. on February 5, 1999, the first thing he noticed was that Wayne's truck was parked in the driveway. This was unusual. Wayne always parked his truck in the garage when he was at home. Next, Ronald discovered that the side door to the garage was locked. This was odd also. Wayne usually left this door unlocked because he would not be able to hear if someone knocked on it. After repeatedly beating on the door without an answer, Ronald walked around the perimeter of the house, knocking on various windows to elicit a response in the event that someone was inside. When this proved fruitless, Ronald looked around for a key. Finding none, he kicked the door in.

The door inside the garage furnished access to the house and was normally always locked, but Ronald found it unlocked that afternoon. After searching the entire house, Ronald left a note requesting that Wayne call him as soon as possible. In the driveway, Ronald discovered a set of unfamiliar sunglasses. He then decided to check with the neighbors to find out whether they had seen or heard anything out of the ordinary. None were home. At this point, Ronald telephoned the police.

A police officer arrived fifteen minutes later and began to search the house. Discovering nothing of any significance, the officer left but Ronald continued to look around. A man named "Junior" who worked for Ronald and Wayne came by the house and helped Ronald search. They noticed spots resembling blood stains on the side of Wayne's truck. The men also discovered "drag marks" characterized by flattened areas where the grass appeared to be "laying down." The marks led to a "crawl area" underneath the house. Inside the crawl area the two men discovered Wayne's body hidden underneath what appeared to be a styrofoam cushion. Ronald immediately telephoned the police.

Ronald further testified that Wayne did not keep a gun at his house. To his knowledge, Wayne owned a .22 caliber rifle and a shotgun, but he kept both of his guns at his parents' house. Wayne's height was six feet, one inch, and he weighed 190 pounds. Wayne had a black belt in one of the martial arts, but Ronald was uncertain which one.

Robert Fohrd, a patrol officer with the Hendersonville Police Department, testified that on February 5, 1999, he was dispatched to 146 Luna Lane (Wayne's residence address) on a "suspicious

incident call." Fohrd was met at the residence by Ronald Cope, who informed him that his brother, Wayne, was missing. After Ronald explained to Fohrd the circumstances which caused him to suspect foul play, they searched the house but initially found nothing unusual. Fohrd returned to the police department to file a missing persons report and talk with his supervisor, who requested that Fohrd meet him back at Wayne's house. Meanwhile, Ronald had telephoned the police to report that he discovered his brother's body. Fohrd informed his supervisor of the discovery and returned to the victim's house to secure the crime scene. When Fohrd arrived, the body was lying on the basement floor, wrapped in purple cloth and tied up with a yellow extension cord. He did not see the body during his initial investigation because it had been covered with what appeared to be carpet padding.

Twenty-nine-year-old James Lee Pattee testified that he was the son of Defendant and Jennifer, who were still married but had been living separately since September or October of 1998. When they first separated, Defendant had continued to live in the house that he and Jennifer had owned together in Franklin, Kentucky. Jennifer had moved into an apartment closer to her job in Nashville. James saw his mother and father together only once after they separated. On this occasion, Jennifer had come to visit James at his apartment. When Defendant arrived, she immediately became frightened and nervous. Jennifer was aware that James owned a gun and asked him to hide it. Later, in January of 1999, James learned that Jennifer had been seeing a man named Wayne Cope but he never met him.

James testified that Defendant owned a .38 caliber Rossi revolver, a .22 rifle, and a shotgun. Defendant had owned the .38 for as long as James could remember. The last time James saw the .38 was sometime in September, October, or November of 1998, when James and Defendant shot the .38 and the shotgun at some old, metal barrels in Defendant's back yard.

James testified that he learned of Wayne's death from his grandparents. They informed him that Wayne had been killed and his father was a suspect. After James heard the news, he asked Defendant whether or not he had killed Wayne and Defendant replied, "No." They did not discuss the subject further.

Brian Scott Smith, an employee of Nashville Electric Service ("NES"), testified that he had known Defendant for seventeen years. They had both worked for NES but Defendant was forced to quit after he was injured on the job in August 1998. In February 1999, Smith received a phone call from Defendant requesting that he "run an address." Defendant told Smith that he wanted to check the address of a man who was interested in selling a "wave runner" or jet ski. Smith had no reason to disbelieve Defendant, so he found the address and gave it to him. Although Smith did not remember the specific name Defendant gave him to "run," he did recall that the address he gave to Defendant matched the one he already had.

Larry Stevens, a systems analyst at NES, testified that in February 1999, the NES security division told him that the Hendersonville police wanted to know whether anyone had requested data on a man named Cope on or about February 3. A system check revealed that someone had accessed

Dennis Wayne Cope's address at 11:15 p.m. on February 3, 1999. The system report also revealed that the data was requested by NES's emergency line department and that Brian Scott Smith was working in this department on the evening of February 3, 1999.

James Edgar Spearman, a security manager for BellSouth telephone company, testified that part of his job is to act as custodian of the company's telephone records for Middle Tennessee. According to the records, Defendant telephoned the number 502-586-3909 at 11:38 p.m. on February 4, 1999, but received no answer. (The phone number belonged to Jennifer; she had moved back to Franklin, Kentucky by the time the homicide occurred.)

Shirley Forrest, a detective with the Hendersonville Police Department, testified that she was the lead investigator on the homicide case concerning Wayne Cope. Forrest arrived at the victim's residence, 146 Luna Lane, at approximately 5:30 p.m. on February 5, 1999. Initially, Forrest noted that reddish-brown stains consistent with the appearance of blood stains were present on the outside of the house, the driveway, and the passenger side of the victim's truck. Next, she noticed that a flattened area in the grass formed a trail leading from behind the house to the rear door of the house, which in turn led to the basement crawl space where the victim's body was discovered. Additional blood-like stains were located on the inside and outside of the doorway to the crawl space and on the carpet and sewer pipes inside. Entering the residence, Forrest observed that most of the areas toward the back of the house had been "disturbed." In addition, more reddish-brown stains were found on the closet door, the carpeting in the hallway, and outside the bathroom and bedroom. In the garage, the police discovered blood-like stains on the wall, one of the steps, and on the tip of a latex glove found on the garage floor. Bullets were recovered from the floor in the front room and the wall in the dining area. The bullet hole in dining area wall had been covered up with a decorative plate.

Forrest testified that the victim's body was wrapped in a purple velour bedspread with a yellow electrical cord looped several times around the victim's neck and body. Forrest could see moss and bits of grass on the victim's legs and forehead. The victim's head and face showed multiple scrapes, cuts, abrasions and bruises. The victim's abdomen exhibited a gunshot wound with another, different type of wound located immediately to the right of it. Forrest testified that the second wound indicated that the weapon and victim were in very close contact at the time the gun was discharged. When the body was transported to another location for autopsy, Forrest observed a total of three bullet holes: an entrance wound on the left side of the abdomen below the rib cage; a coinciding exit wound on the victim's back, indicating a slightly downward angle of flight; and a third entrance wound on the victim's back, below the shoulder blade. Because of the magnitude of the investigation and resulting processing, the police requested the Tennessee Bureau of Investigation ("TBI") send its mobile crime scene unit to assist.

Defendant's name had surfaced at the beginning of the police investigation as a result of inquiries regarding the identities of persons who may have had a motive for harming Wayne. Approximately four days later, Forrest and two other officers went to interview Defendant at the Gallatin Marina where he was living on a houseboat. When Forrest told Defendant that he wanted

to talk to him about something that recently happened in Hendersonville, Defendant replied that he was unaware that anything had happened and then "just started talking."

Defendant told Forrest that he had discovered some love letters written to his wife by a man named "Wayne." After discovering the letters, Defendant confronted Jennifer but told her that he did not want to know anything about the man. Afterward, on the Monday after Christmas, Defendant moved into a houseboat he owned. On January 19, 1999, Defendant received divorce papers and became very depressed. The following Sunday, January 24th, Defendant became so alarmed by his depressive state that he threw away his .38 caliber handgun "for his own safety," because he was afraid that he would harm himself. Defendant told Forrest that he dismantled the gun and placed the various pieces into separate plastic bags. Afterward, he put each of the bags into different garbage cans throughout the marina, and then cast the bullets into the lake. He explained that he discarded the gun in this fashion so that children would not be able to find it. Defendant further told Forrest that he contacted the NES employee assistance program the next day to get psychiatric help. He said that he was not angry; he merely wanted "order" in his life. During the interview, Defendant favored his left hand which had a tremor. Forrest further noticed that Defendant also had a fairly substantial gouge at the base of his right thumb as well as various other scrapes on his hands.

When asked to relate his activities as they occurred during the week that Wayne was discovered dead, Defendant told Forrest that he had an appointment with his psychiatrist on Wednesday and, after thinking a bit more, that he also tried to work on his boat because it was nice "that day." When Forrest asked him what day he meant by "that day," Defendant answered February 4th. He continued by explaining that he hurt his hand working on the boat's engine, then checked his calendar for other things that may have occurred on "that day." At this point, Forrest had not mentioned to Defendant any specific day or time regarding the homicide. When questioned specifically about Wayne's death, Defendant stated that he did not know anything about it–he did not know anything about the man, his last name or where he lived, and he had never met him or been to his house or talked to him. Days later, on February 11, Defendant called Forrest to tell her that he recalled talking to a neighbor named "Downs" on the evening of February 4 and that he spoke with some other neighbors on the morning of February 5.

Defendant signed a statement (the gist of which contained the above information and was read into evidence at trial), and then gave the police permission to search his boat. Pursuant to the search, the police discovered three latex-type gloves similar to the type of glove found at the murder scene and some clothing with reddish-brown stains. Defendant agreed to be fingerprinted and give the police hair and blood samples. Later, on February 23, Forrest obtained an arrest warrant and a search warrant for Defendant's boat. A second search revealed a .38 caliber handgun and forty-five rounds of ammunition hidden behind a drawer in the kitchen.

Larry Braddon, a store manager at Friedman's Army-Navy in Nashville, testified that on February 16, 1999 (twelve days after Cope's murder) Defendant purchased a .38 caliber "Davis" pistol.

Ray DePriest, a forensic scientist working for the TBI, testified that he specialized in the field of serology (the study of human body fluids) and DNA analysis. Specifically, his job entailed comparing stains collected from a crime scene to known blood standards through the use of serological and/or DNA profiling methods. DePriest belonged to a TBI crime scene unit which typically consisted of several TBI agents with extensive training in specialized areas: specifically, a firearms expert, a latent fingerprint examiner, a microanalyst, and a serologist DNA expert, such as DePriest.

On February 5, the TBI received a request from the Hendersonville Police Department to assist local law enforcement in collecting and processing evidence. The TBI crime unit arrived shortly thereafter and began processing the exterior of the victim's house. The DNA profile results indicated that the blood samples recovered from the stains found on the victim's truck belonged to Defendant. DePriest further testified that the probability of someone else's blood having the same profile as Defendant's was less than one in six billion. The same profiling test was performed on blood samples recovered from a latex glove tip, a vacuum cleaner from inside the house, a belt from the victim's pants found lying on the bedroom floor, the carpet from the hallway, and the clothing taken from Defendant's boat. All samples contained blood belonging to Defendant.

Teri Arney, a TBI forensic chemist assigned to work in firearms identification, testified that she was a member of the TBI crime unit called to process the crime scene on February 5, 1999. Arney testified that the bullets recovered from the victim's body and the crime scene were all fired from a Rossi, Ruger, FIE, or similar make of .38 caliber revolver. Because of the mutilated condition of the bullets, however, Arney could not tell whether all of the bullets recovered from the crime scene were fired from the same gun. Arney further testified that the victim's stomach wound was inflicted from a very close range, i.e., the bullet hole was characteristic of a "contact or near-contact" shot. By contrast, the bullet wound to the victim's back was inflicted from a distance of approximately five feet or more.

Oakley McKinney, a TBI forensic expert in the area of latent fingerprint processing, testified that he was also a member of the TBI crime unit called to assist the Hendersonville police. McKinney processed a palm print recovered from the door to the basement where the victim's body was discovered. The print belonged to the right hand of Defendant.

Dr. Charles Harlan, a forensic pathologist, testified that he performed an autopsy on the victim, Wayne Cope. The cause of death was found to be gunshot wounds to the chest and abdomen. Dr. Harlan testified that the victim suffered a total of three gunshot wounds, two wounds of entry and one of exit, which were caused by two gunshots. Specifically, the shot to the chest entered the upper left portion of the abdomen, forty-eight inches above the heel, and exited above the back of the left hip bone, forty-two inches above the heel. The trajectory of the bullet through the body shows a downward angle of travel (a six-inch drop from entrance to exit wound). The wound to the victim's back entered below the tip of the left scapula (shoulder blade) and did not exit. Instead, this bullet lodged in the victim's spinal canal. The wound to the chest was fatal because it caused bleeding as it passed through the lung and also cut the small intestine in three places which would

cause a fatal infection at a subsequent time. By contrast, the bullet which entered the victim's back would have caused paralysis from the waist down if he had lived. Dr. Harlan further testified that abrasions present on the victim's face, hands, and legs were consistent with injuries which could have occurred before, during, or within fifteen minutes of the victim's death. In sum, the victim's collective injuries indicated that he was shot twice and then, at or about the time he died, dragged by the feet so that his face was rubbed against either carpet or asphalt. At some point afterward, the victim was also dragged by his head so that his feet became similarly scraped.

The defendant, Robert Lee Pattee, Jr., testified that he and his wife, Jennifer, moved to Franklin, Kentucky in October of 1997. In July of 1998, Jennifer went back to work in Nashville and rented an apartment close to her job. When Defendant helped her move her belongings and asked her for a key to her new apartment, she responded "No." It was at this point that Defendant feared their marriage was over. In the weeks immediately following Jennifer's move, she would frequently return to Kentucky on weekends but this did not last long. Within a few months she was coming home less and less. On August 30, 1998, Defendant was injured on the job and forced to quit working. In November he underwent surgery, and in December of 1998 the house that he and Jennifer had owned accidentally burned down. Defendant then moved into the houseboat which he had purchased in June of 1998.

Defendant learned that Jennifer was seeing Wayne during the week after Christmas 1998. Jennifer had since returned to Franklin, Kentucky to live close to her parents. While Defendant was helping Jennifer move back, he found two love letters and a picture of a man. The back of the photo was signed "Wayne." Defendant testified that he confronted Jennifer with the fact that he "knew about Wayne," but told her he did not want to know anything more about him.

Defendant testified that, in January of 1999, he received divorce papers and this devastated him. The next Sunday he placed a gun in his mouth and was about to pull the trigger when he looked up and saw a photo of his grandchildren. At this, he changed his mind and dismantled his gun, placing the pieces in different bags for disposal in various garbage receptacles. He claimed that he did not want anyone to see him toss a gun into the water. Defendant threw the bullets into the lake.

Shortly thereafter, Defendant was returning from a shopping trip when he observed Jennifer's car. Defendant testified that he followed it to 146 Luna Lane, wrote down the address, and then drove back to his boat. Later on, Defendant drove by the address again. This time he stopped and looked in the mailbox to learn the name of the occupant. Then, to satisfy his "curiosity," Defendant called a friend at NES to verify the name and address and find out if Dennis Wayne Cope owned any other property. At this time, Defendant had been trying for days, unsuccessfully, to contact his wife to inform her that her car insurance was about to be cancelled. He had concluded that she was out of town since her car remained parked in front of her house. On the evening of February 4, 1999, he telephoned her again but received no answer. After he hung up at approximately 12:15 a.m., Defendant drove over to 146 Luna Lane to talk to Wayne about Jennifer, "hoping that he would understand [Defendant's] point of view." Defendant claimed that he had no knowledge of their plans to be married.

When Defendant arrived at Wayne's residence on Luna Lane, he knocked on the front door several times before he heard anyone respond. The door was still closed when Wayne asked who it was. Defendant told him. Then Wayne asked Defendant what he wanted, and Defendant replied that he wanted to talk to Wayne about his wife. Wayne asked whether Defendant had any weapons on him. Defendant replied, "No," but Wayne said, "I know you've got a gun." After Defendant informed Wayne that he had gotten rid of it, Wayne told Defendant "to go around to the side door by the garage." Defendant did as he asked and stood there for a while. When Wayne opened the door, he made Defendant pull up his shirt and pant legs to reveal that he had no weapons on him. Wayne let Defendant inside, then patted him down in a further search for weapons before they went into the kitchen to talk.

Once in the kitchen, Defendant told Wayne that he still loved his wife and would appreciate it if Wayne would not see her anymore. Defendant testified that this statement made Wayne "really mad." Wayne then showed Defendant some photographs of Jennifer with his family. One showed Jennifer talking on the phone and wearing nothing but a shirt. The following words were on the back: "We got done early, so we made love till 2:30." Defendant claimed that this "hit" him.

Meanwhile, Wayne had come up behind Defendant with a pistol. He put it in Defendant's face and said, "I'll take care of this problem of Jennifer's right now." Defendant testified that he then grabbed the gun with his right hand and they started wrestling. (Defendant was left-handed, but he claimed that his left hand had been injured.) As Defendant struggled to keep the gun pointed away from him, it went off. When this happened, Wayne moaned and loosened his grip on Defendant. Defendant thought he "saw [his] chance" to get away. As he tried to run out of the house, however, Wayne caught him in the hallway and hit him in the back of the head "with a pistol or something." As Defendant "went down," Wayne "continued to beat on [Defendant] there on the tip and on the back of [his] head. Then he kicked [him] in the ribs . . . where he had trouble with [his] accident." At some point, Defendant was able to use both feet to push Wayne off of him and try to escape again. But Defendant had only reached the kitchen when Wayne "hollered for [him] to stop or he – he was going to shoot [him] right there." Defendant stopped. When he turned around, Wayne pointed his gun at him and said, "This is going to work out just right, you know." Wayne explained to Defendant that he was going to kill him, and then claim that Defendant broke into his house so he was forced to shoot him in self-defense. Wayne further expounded that, since his gun had the serial numbers removed from it, Wayne planned to tell the police that the gun belonged to Defendant. Wayne was raising the gun to Defendant's head as he talked, but then he stepped on a cat or something and fell over. As Wayne fell, Defendant threw something "like a cell phone" at him which had been sitting on a table nearby. The gun went off, and Defendant felt the bullet sail past his ear.

Wayne had hit his head and was laying there motionless, so Defendant got the gun out of his hand and said, "Stop right now." At this, Wayne got up, knocked Defendant down again and started kicking him. Defendant testified that he kept telling Wayne to stop because Defendant now had possession of the gun. Wayne did not stop, however. Instead, he went into the kitchen and returned with a knife. As he lunged at Defendant, Defendant stepped away, but Wayne only lunged at him

-8-

again.  The second time, Defendant tried to shoot him in the shoulder as he went by.  Defendant claimed that this accounted for the victim's back wound.  After Wayne was shot the second time, he fell back into the garage and Defendant heard no further sound or movement.  When Defendant finally peered into the garage, Wayne was lying face down in a pile of boxes.  Defendant checked for a pulse but found none.

Defendant testified that he did not call the police because he was "scared."  He looked for his glasses and discovered them laying in the hallway, smashed to pieces.  Defendant felt that he needed some time and did not want to leave Wayne lying there, so he rolled the body up in a bedspread.  Defendant claimed that "never once did he abuse [Wayne]."  Instead, he apologized to him as he tied an extension cord around the dead body.  Defendant could not drag Wayne's body through the garage door because Wayne's truck was parked too close, so Defendant moved his truck.  He reached into the cab, put the truck into neutral, and pushed it out of the way.  Since Wayne was a "pretty healthy fellow," it then took Defendant approximately an hour to drag him the length of the house to the crawl space where he hid the body.

Defendant testified that the blood found on the truck and in the house came from a wound to his thumb.  He tried to stop the bleeding by putting on a pair of latex gloves that he carried around in his toolbox.  The plate covering the bullet hole was placed there by Defendant in an effort to straighten up the scene after he killed Wayne.  Defendant thought he was merely replacing the plate he had knocked down during the skirmish.  He did not know that a bullet hole was underneath it because he had broken his glasses and could not see well.  The vacuum cleaner had also been knocked down, so he set it upright.  Defendant left Wayne's house at approximately 3:30 a.m.  He dropped the gun and the knife into the Cumberland River from the bridge on Highway 109 on his way back to his boat.

Defendant claimed that, initially, he did not fear Wayne and that he never intended to kill him but he did begin to fear for his life when Wayne started waving his gun around.  Defendant testified that he did not have a gun with him when he went to talk with Wayne.  Defendant purchased a weapon after the killing, on February 16, because he was had received numerous anonymous phone calls from people who would hang up when he answered.  In addition, people had been driving up to his boat at night and shining their headlights into the cabin.  Defendant "figured somebody was after [him] for what happened to [Wayne]."

During cross-examination, Defendant explained that he went to see Wayne personally, instead of speaking to him by telephone, because some things "have to be said in person."  Defendant denied that he went to Wayne's house expecting to find Jennifer or to catch his wife with another man.  Defendant admitted that the morning after the killing, he met his friends for breakfast just like he did every Friday as though nothing was wrong.  Defendant also admitted that when he was questioned about the killing he falsely told everyone, including the police and his son, that he knew nothing about the incident.

**ANALYSIS**

## I. Jury Instructions

Defendant contends that the trial court erred by refusing his request to instruct the jury on the lesser-included offense of voluntary manslaughter. Specifically, Defendant argues that the evidence was sufficient to support a conviction for voluntary manslaughter and therefore, under State v. Burns, 6 S.W.3d 453 (Tenn. 1999), he was entitled to instructions for the lesser-included offense. We disagree.

Defendant was indicted for first degree murder, Tenn. Code Ann. § 39-13-202, which is defined, in part, as the "premeditated and intentional killing of another." Specifically, defendant was charged with "unlawful, felonious, intentional and premeditated killing" of the victim, Dennis Wayne Cope. Voluntary manslaughter differs, in part, from first degree murder in that it is the "intentional or knowing killing of another in a *state of passion produced by adequate provocation* sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211 (1997) (emphasis added).

"A trial court's duty to charge juries as to the law of each offense 'included' in an indictment has been statutorily mandated in this State for some time." State v. Burns, 6 S.W.3d 453, 464 (Tenn.1999); see also Tenn. Code Ann. § 40-18-110(a) (1997) (obligating the trial judge to charge "the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so"). Defendant's argument fails for two reasons.

First, Defendant was not entitled to instructions for voluntary manslaughter as a lesser-included offense under Burns. Voluntary manslaughter is clearly a lesser-included offense of first degree and second degree murder. State v. Dominy, 6 S.W.3d 472, 477, n.9 (Tenn. 1999). Neither party disputes this. However, our supreme court's decision in Burns does not require the trial court to instruct the jury on all lesser-included offenses of the charged offense. Under Burns, whether a lesser-included offense should be charged is a two-step analysis. Initially, the trial court must determine whether any evidence exists which reasonable minds could accept as to the lesser-included offense. Burns, 6 S.W.3d at 469. When making this determination, the trial court is obligated to view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Id. Next, the trial court must determine whether the evidence, when viewed in this light, is legally sufficient to support a conviction for the lesser-included offense. Id.

The record reveals that, after the conclusion of proof and before instructing the jury, the trial court heard arguments from Defendant and the State regarding the proposed instructions. The State argued then, as it does in its brief to this Court, that the proof adduced at trial was insufficient to sustain a conviction for voluntary manslaughter. The trial court agreed, finding that the evidence presented at trial did not show "that passionate response that . . . calls for the voluntary manslaughter instruction." As the trial court pointed out, "at no time . . . did [Defendant] say he was upset. He said . . . he was [at the victim's house] to discuss the matter." And, when Defendant was asked whether he felt better or worse the day after he killed the victim, he stated merely that he felt "no

different." Thereafter, the trial court concluded that to find Defendant guilty of voluntary manslaughter would require a "strained interpretation" of the evidence.

After a review of the record, we concur with the trial court's conclusion that Defendant was not entitled to a jury instruction for voluntary manslaughter. The record contains no evidence which reasonable minds could accept as to the crime of voluntary manslaughter, even when viewed liberally in the light most favorable to the existence of such crime and without making any judgments concerning credibility. Defendant's testimony at trial was aimed to support his claim of self-defense. As the trial court observed above, at no time did Defendant provide evidence that his actions were the result of "adequate provocation." Even Defendant's reaction to the photo of his half-dressed wife, complete with sexually-explicit commentary on the back, failed to suggest that Defendant was operating under the requisite "state of passion" for voluntary manslaughter. Defendant testified only that the photo "kind of really hit [him] right there."

Secondly, even if it were error not to instruct the jury on voluntary manslaughter, such error would be deemed to be harmless. See State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998) ("the trial court's erroneous failure to charge voluntary manslaughter was harmless beyond a reasonable doubt because the jury's verdict of guilt on the greater offense of first degree murder and its disinclination to consider the lesser-included offense of second degree murder clearly demonstrates that it certainly would not have returned a verdict on voluntary manslaughter"). For the forgoing reasons, Defendant is not entitled to relief on this issue.

## II. Admissibility of Evidence

Defendant argues that the trial court's failure to allow Defendant to introduce his suicide note into evidence at trial constituted error. Defendant contends that the State's method of impeachment transformed the character of his suicide note from a "self-serving" hearsay statement to a prior consistent statement which was then necessary and, therefore, admissible to rehabilitate Defendant at trial. We disagree.

Regarding admissibility of evidence in general, "[i]t is well-established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of discretion." State v. Stinnett, 958 S.W.2d 329, 331 (Tenn.1997). Out of court statements are generally not admissible because they are considered to be hearsay. See Tenn.R.Evid. 801, 802. This includes prior consistent statements offered to bolster the witness' credibility. See Farmer v. State, 296 S.W.2d 879, 882 (Tenn. 1956); State v. Braggs, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980).

An exception exists when the prior consistent statement is offered to rehabilitate a witness after a witness has been impeached by a prior inconsistent statement, or when insinuations of recent fabrication have been made or deliberate falsehood implied. See Farmer, 296 S.W.2d at 882; State v. Tizard, 897 S.W.2d 732, 746 (Tenn. Crim. App. 1994); State v. Benton, 759 S.W.2d 427, 433 (Tenn. Crim. App.1988). The witness' testimony must have been attacked to the extent that the

witness' testimony needs rehabilitating. Benton, 759 S.W.2d at 434. And, where a prior consistent statement is introduced into evidence at trial, it must have been made before the inconsistent one. See Tizard, 897 S.W.2d at 746; Neil P. Cohen et al., Tennessee Law of Evidence § 803(1.1).3 (3d ed. 1995).

When Defendant was first questioned by the police regarding the victim's death, he denied having any knowledge of the crime or the victim. Subsequently, the police gathered evidence against Defendant and obtained a warrant for his arrest. On April 27, 1999, while Defendant was in jail, he wrote and mailed a suicide note before attempting, unsuccessfully, to commit suicide. The suicide note contained Defendant's summary of the events leading to the killing, including his fight with the victim and claim of self-defense. After obtaining the note, the State filed a pre-trial motion in limine to prohibit Defendant from referring to or introducing the suicide note at trial and Defendant acquiesced. The trial court granted the State's motion.

After the State's cross-examination of Defendant at trial, Defendant requested a jury-out hearing to reargue admissibility of the suicide note on the ground that the State rendered it a "prior quasi consistent statement" when it questioned Defendant. Specifically, Defendant argued that the prosecutor's statement wherein he claimed that Defendant "never once told anyone that this man was lying, wrapped up, in his own home down in his crawl space . . . ," effectively "opened the door" for Defendant to introduce rebuttal evidence that he did, in fact, tell someone about the killing when he wrote the note. Defendant also asserted that the note was necessary to rehabilitate Defendant after the State's implication that Defendant's self-defense argument was a recent "fabrication." The State responded that Defendant "misread the context" of its questions, i.e., the State had only pointed out that on the day after Defendant committed the killing, he went about his business as though nothing had happened and without a word to anyone about the homicide. The trial court agreed with the State, commenting that the State's interpretation was "the context in which the Court took it," but also consented to reread the transcript and hear further argument before ruling on the matter. After doing so, the trial court denied Defendant's request, finding that "it was fairly clear . . . that the door was not opened."

After a review of the record, we agree with the trial court that the State's line of questioning did not "open the door" to allow Defendant's note into evidence for purposes of rebuttal. Neither did the State's comments infer that Defendant's claim of self-defense was a "recent fabrication" requiring rehabilitation. Conversely, the record reveals that the State asked Defendant if the discovery of his palm print at the murder scene on February 22, 1999 (seven months prior to trial) was what caused him to change his story from alibi to self-defense. This statement opposes any implication that Defendant only "recently" concocted the self-defense theory. Thus, the trial court did not abuse its discretion when it refused to admit Defendant's note into evidence.

Lastly, Defendant's suicide note could not be used to refute the inconsistent statements he made to the police concerning an alibi, since any and all statements wherein Defendant claimed he was acting in self-defense clearly occurred *subsequent to* the alibi claims. Where a prior consistent statement is introduced at trial, it must have been made before the inconsistent statement to be

admissible.  See Tizard, 897 S.W.2d at 746; Neil P. Cohen et al., Tennessee Law of Evidence § 803(1.1).3 (3d ed. 1995).  Defendant is not entitled to relief on this issue.

### III.  Sufficiency of the Evidence

Defendant argues that the evidence of premeditation presented at trial was insufficient to convict him of first degree murder.  In a similar vein, Defendant contends that the evidence fairly raised the issue of self-defense and that the State failed to carry its lawful burden to disprove it.  Therefore, because the State failed both to prove premeditation and to negate Defendant's claim of self-defense beyond a reasonable doubt, Defendant asserts that the judgment of the trial court must be reversed.  We disagree.

The proper inquiry for an appellate court determining the sufficiency of evidence to support a conviction, is whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).  "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory."  State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  Questions about the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the jury, not this Court.  Id.  Nor may this Court substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact.  See Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956).

The standard for appellate review is the same whether the conviction is based upon direct or circumstantial evidence.  See State v. Vann, 976 S.W.2d 93, 111 (Tenn. 1998).  A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone."  State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn.1985)).  A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury.  Id.; see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  In contrast, the State on appeal is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence.  See Hall, 8 S.W.3d at 599; Bland, 958 S.W.2d at 659.

#### A.  Premeditation

First degree murder is defined, in part, as "the premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1)(1997).  "Premeditation" is described as "an act done

after the exercise of reflection and judgment." Id. § 39-13-202(d). To find a defendant guilty of premeditated murder, "the intent to kill must have been formed prior to the act itself," and it must be determined that "the accused was sufficiently free from excitement and passion as to be capable of premeditation." Id. "Intentional" refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result. Id. § 39-11-302.

Because premeditation entails proof of a state of mind about which there may be no direct evidence, "cases have long recognized that the necessary elements of first degree murder may be shown by circumstantial evidence." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Premeditation is a question of fact to be determined by the jury. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). And, the jury may infer premeditation from the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 915 (Tenn. 1998); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our supreme court has enumerated several factors that may support the existence of premeditation and deliberation, including: (1) declarations by the defendant of an intent to kill, (2) evidence of procurement of a weapon, (3) the use of a deadly weapon upon an unarmed victim, (4) the particular cruelty of the killing, (4) infliction of multiple wounds, (5) preparation before the killing for concealment of the crime, (6) destruction or secretion of evidence of the murder, and (7) calmness immediately after the killing. State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000) (citations omitted). Although deliberation is no longer an element of first degree murder in Tennessee, the two elements were considered similar. See id. (factors used by the court were relevant to either premeditation, deliberation, or both). The primary difference is timing. Premeditation is capable of instantaneous formation, while deliberation required some period of reflection, during which the mind was "free from the influence of excitement, or passion." Id. (citing State v. Brown, 836 S.W.2d 530, 540 (Tenn.1992)).

Here, the evidence at trial presented at least three of the above factors from which the jury could infer premeditation. First, Defendant used a deadly weapon on an unarmed victim. There was only one gun, and Defendant possessed it when he shot the victim. Although the victim was able to arm himself with a knife at a later point in the struggle (according to Defendant's version of self-defense), the first bullet wound was the primary cause of death according to the testimony of Dr. Harlan. Second, Defendant inflicted multiple wounds on the victim, one in the back and another in the abdomen. Third, calmness after the killing, is made apparent by Defendant's testimony that he went home, cleaned up, then met his friends for coffee. Other related factors include Defendant's stalking his wife as she drove to the victim's house; his snooping through the victim's mail to verify his identity; and his confirming the victim's address through his contact at NES. In their totality, the aforementioned circumstances are sufficient for a jury to infer that Defendant's account of his own gun's disappearance was untrue and that Defendant, instead, took his gun to the victim's house with the intent to kill him and did so, disposing of the gun afterward so that he later found it necessary to buy a replacement. Whether or not premeditation existed is a jury question, and Defendant has not met his burden of illustrating why the evidence is insufficient to support their decision regarding this matter.

**B. Self-Defense**

Defendant also contends that the evidence presented at trial fairly raised the issue of self-defense as a justification for his crime and, thus, the State was required by law to negate this defense beyond a reasonable doubt. Defendant asserts that his conviction should be reversed because the State failed to carry this burden. We disagree.

In Tennessee, "a person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force." Tenn. Code Ann. § 39-11-611(a) (1997). The person must have "a reasonable belief that there is an imminent danger of death or serious bodily injury." Id. Furthermore, "[t]he danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. Id. No person may be convicted of an offense unless the prosecution proves, beyond a reasonable doubt, "[t]he negation of any defense to an offense defined in this title if admissible evidence is introduced supporting the defense . . . ." Id. § 39-11-201(a)(3). Self-defense qualifies as such a defense. Id. § 39-11-610; State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). And, "[t]he issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c).

Since the trial court granted Defendant's request to submit instructions to the jury on the issue of self-defense, we find any question regarding whether the defense was fairly raised was previously settled in Defendant's favor. See id. § 39-11-203(c). The remaining question concerns whether the State negated Defendant's claim of self-defense beyond a reasonable doubt. We find that much of the same evidence which proved that Defendant acted with premeditation would similarly prove that he did not act in self-defense. For example, we find the following facts may properly infer that Defendant did not act in self-defense: Defendant made certain that he had the correct address of the victim; Defendant visited the victim after midnight (not a socially acceptable time for most people to visit unexpectedly); one of the gunshot wounds entered the victim's *back*; Defendant destroyed or concealed the evidence of the crime; and, Defendant gave false statements to everyone, including his family, when questioned about the incident.

The record reveals that the trial court granted Defendant's request that the trial judge give the jury Tennessee Pattern Jury Instruction 36.02. Since this instruction requires that the trial judge point out that the burden was on the State to prove beyond a reasonable doubt that Defendant did not act in self-defense, we may assume that this is what they found. Juries are presumed to follow the instructions given by the trial judge. State v. Williams, 977 S.W.2d 101, 106 (Tenn.1998). Granted, circumstances which favored the Defendant's claim of self-defense were also presented at trial, e.g., that the victim was the owner of the gun, that the victim attacked Defendant first, et cetera. However, credibility issues are matters for the jury to resolve, not this Court. Defendant is not entitled to relief on this issue.

**IV. Conclusion**

For the forgoing reasons, we AFFIRM the judgment of the trial court.


_____
THOMAS T. WOODALL, JUDGE